#26169-a-JKK

**2012 S.D. 75**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

BRENT BENSON,                                              Petitioner and Appellee,

    v.

MICHELLE LOFFELMACHER,                    Respondent and Appellant.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JOHN J. DELANEY
Retired Circuit Judge

\* \* \* \*

MARCIA WHITING
Rapid City, South Dakota                         Attorney for petitioner
                                                                  and appellee.

MURL L. WOODS
Rapid City, South Dakota                         Attorney for respondent
                                                                  and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON AUGUST 27, 2012

OPINION FILED **10/31/12**

KONENKAMP, Justice

[¶1.] In this custody dispute, the circuit court awarded joint legal custody to both parents and primary physical custody to the father, and the mother appeals. We affirm.

## Background

[¶2.] Michelle Loffelmacher and Brent Benson had a child out of wedlock. Michelle told Brent about her pregnancy before their child's birth. On December 8, 2004, A.L. was born, and a paternity test confirmed Brent as her biological father. Brent had only limited involvement with A.L. after her birth until late 2007. He lived in Minnesota during that time, but would send A.L. presents and occasionally visit her at Michelle's home in Rapid City.

[¶3.] In 2007, Brent moved to Dickinson, North Dakota, near his parents' residence. Michelle's sister, Cheryl, lived twenty-five miles south in New England, North Dakota. Michelle frequently took A.L. to Cheryl's home, at which times Brent would visit A.L. Gradually, Brent began to take A.L. from Cheryl's home to his parents' house. There, Brent's mother operated a daycare and would watch A.L. while Brent exercised visitation. When his time for visitation ended, Brent would return A.L. to Cheryl's home. Cheryl would return A.L. to Michelle, or Michelle would drive from Rapid City to North Dakota to retrieve A.L.

[¶4.] In November 2007, Brent petitioned the circuit court to establish paternity, custody, and visitation. Michelle responded with a request to modify child support. Before trial, they agreed that Michelle would retain physical custody of A.L. and drop her request to modify child support, and Brent would exercise

visitation for one week every other month at Brent's mother's home. This arrangement continued until Brent petitioned for a change of custody in October 2010, with an accompanying motion for an emergency change of custody. Brent believed Michelle's mental health issues prevented her from adequately caring for A.L.

[¶5.] At a hearing in November, the circuit court denied Brent's request for an emergency change of custody. The court ordered a professional custody evaluation and scheduled an evidentiary hearing for January 2011. At the time of the hearing, the custody evaluation was not yet complete. Nonetheless, Brent, his mother, Michelle's sister, Cheryl, and Cheryl's husband testified on Brent's behalf. They spoke about Brent's care of A.L. and about Michelle's depression and mental health issues, particularly Michelle's inability to care for A.L. when she was depressed. They also described the nature of Michelle's relationships with three men. To refute Brent's allegations, Michelle introduced several character witnesses. They testified about the appropriateness of Michelle's care of A.L. and her management of her mental health issues.

[¶6.] After the hearing, the court took the issue under advisement and allowed the parents to submit post-hearing briefs. Ultimately, in March 2011, the court awarded interim custody to Brent. It based its decision on Michelle's mental health problems, which had impaired her ability to care for A.L. in the past, and which would likely continue at certain times in the future. The court also focused on the fact that Michelle had inappropriately exposed A.L. to three live-in boyfriends.

[¶7.]　　　On June 29, 2011, the custody evaluator, Thomas Collins, submitted his report to the court.  He addressed each of the factors from *Fuerstenburg v. Fuerstenberg,* 1999 S.D. 35, 591 N.W.2d 798.  On the issue of the parents' physical and mental health, Collins concluded that Brent had a "strong advantage."  He explained that Michelle "has a history of mental health disorders, including depression, anxiety, and an adjustment disorder, and she was voluntarily admitted to Rapid City Regional Psychiatric Unit in 2007."  He noted that Michelle "has counseled with several different providers since 2005 and has been variously diagnosed with Bipolar II, with recurring depression, major depression, general anxiety disorder, obsessive compulsive disorder, ADHD, dyslexia, and has received a global assessment of function ratings ranging from 40 to 65."  Michelle had gone long periods without her medication, "exasperating her symptoms, and impacting her ability to care for [A.L.]"

[¶8.]　　　Collins also believed that Brent had the advantage in being able to provide A.L. with protection, food, clothing, medical care, and other basic needs, although he concluded that Michelle could also provide for those needs.  Collins reported that Brent had "an excellent career" and "the financial ability to provide" for A.L.

[¶9.]　　　On ability to give A.L. love, affection, guidance, education, and impart a faith or creed, Collins thought Michelle had "a positive relationship with [A.L.] and provide[d] guidance and [was] involved with [her] educational development." He also observed that Brent had "a positive relationship with [A.L.], and provide[d] proper guidance and [was] involved in her educational development."

[¶10.] Michelle had a slight advantage, according to Collins, on the willingness to maturely encourage and provide frequent and meaningful contact between the child and both parents. Collins believed that since Brent had obtained custody of A.L., he had been reluctant to encourage A.L.'s time with Michelle, and he "need[ed] to be more positive with [A.L.] in regards to her time with" her mother.

[¶11.] Finding that Michelle exhibited some boundary issues with A.L., Collins gave Brent a slight advantage on the factor related to parental commitment to preparing the child for adulthood and ensuring a fulfilling childhood. Although Michelle was preparing A.L. for responsible adulthood, Collins opined that Michelle "need[ed] to establish clear boundaries with [A.L.] in the areas of personal hygiene and sleeping arrangements."

[¶12.] Collins gave Brent the advantage on the ability to present to his child the model of a good parent, a loving spouse, and a responsible citizen. On this factor, Collins emphasized that Michelle had exposed A.L. to two failed live-in boyfriend relationships. Indeed, one of her boyfriends had given Michelle concern that A.L. had been sexually abused, which "was stressful for [A.L.], and resulted in counseling[.]"

[¶13.] Collins rated the parents nearly equal on A.L.'s relationship and interaction with Brent, Michelle, stepparents, siblings and extended family. He recognized that A.L. had a "strong attachment" to Michelle and a "positive attachment with" Brent. Collins gave Michelle the advantage on the factor assessing A.L.'s adjustment to home, school, and community, because A.L. was just becoming familiar with Brent's community, whereas she had resided with Michelle

since birth. Collins also concluded that A.L. had a closer attachment to Michelle. On the factor of continuity, however, Collins gave Brent the advantage, explaining that Brent had lived and worked in Dickinson, North Dakota for the past ten years and would likely continue this lifestyle, whereas Michelle had "a history of changing relationships and [would] likely consider moving to Dickinson to be near [A.L.]"

[¶14.] Harmful parental misconduct was a concern for Collins. He addressed Michelle's three live-in relationships and her lack of regard for how those would affect A.L. One relationship resulted in a referral to child protection services for possible sexual abuse. Collins also examined Michelle's mental illnesses and emotional disturbances. Although Michelle's illnesses were not her fault, she "failed to maintain continuity in treatment, resulting in periods of time [where] she [had] been unable to care for [A.L.]" Collins faulted Brent for not being involved in A.L.'s "life for much of her first four years, and as such, did not encourage their relationship."

[¶15.] Collins recommended that Brent maintain custody, writing that although "in most cases this evaluator would suggest [Michelle] continue as the primary caregiver," here there were concerns about "harmful misconduct or an inability to provide care." With his recommendation, Collins also proposed a visitation schedule.

[¶16.] After Collins issued his report and recommendation, a hearing was held in August 2011. The court indicated that it would be considering the evidence and testimony from the earlier interim hearing along with any new evidence. At the conclusion of the hearing, the court issued an oral ruling. Concurring with

Collins's report, the court reiterated the concern about Michelle's long-term management of her mental health issues that, when unmanaged, made her unable to care for A.L. It also expressed its unease with Michelle's exposure of A.L. to three different men with whom Michelle had romantic, live-in relationships. The court gave joint legal custody to both parents and physical custody to Brent. Michelle appeals, asserting that the court abused its discretion when it awarded Brent physical custody, and used the wrong standard to evaluate a change of custody.*

## Analysis and Decision

[¶17.]    Michelle contends that the circuit court abused its discretion when it awarded custody to Brent, because the court entered multiple clearly erroneous findings. First, Michelle argues that the court erred when it found that her mental health condition made her unable to care for A.L. Second, Michelle asserts error in the finding that her relationships negatively impacted A.L. Michelle also faults the court's findings for not giving sufficient consideration to the "harm perpetrated upon A.L. by Brent's failure to establish a relationship with her until she was two and one-half years old," and Brent's reliance on Michelle's sister and his mother to care for A.L. when he exercised visitation.

---

\*      A court's findings of fact in a custody dispute are reviewed for clear error. *Maxner v. Maxner*, 2007 S.D. 30, ¶ 10, 730 N.W.2d 619, 622 (citing *Arneson v. Arneson*, 2003 S.D. 125, ¶ 14, 670 N.W.2d 904, 909) (additional citation omitted). We review the court's application of the law de novo. *Arneson*, 2003 S.D. 125, ¶ 13, 670 N.W.2d at 909. However, "in our review of an ultimate decision on custody, we decide only whether the court abused its discretion." *Id.* ¶ 14 (citing *Fuerstenberg*, 1999 S.D. 35, ¶ 22, 591 N.W.2d at 807).

[¶18.] Although Michelle avers that the court concluded that her mental health prevented her from caring for A.L., the court in fact found that, when untreated, Michelle's mental health issues made her unable to care for A.L. And because Michelle had a history of inconsistent management of her mental health, the court deemed Michelle's mental health issues to be an important consideration in its decision to place primary physical custody of A.L. with Brent. Michelle does not dispute that, when unmanaged, her mental health issues have caused her to be unable to care for A.L. Collins, the custody evaluator, similarly found reason to be concerned about Michelle's inconsistent management of her mental health. Michelle's sister testified about first-hand experiences with Michelle when her mental health was unmanaged. The record supports the court's finding that, when unmanaged, Michelle's mental health problems caused her to be unable to care for A.L.

[¶19.] Michelle next claims that although she has had three live-in relationships since 2007, the court erred when it found that A.L. was harmed as a result of those relationships. In the circuit court's view, Michelle's relationships with three men, living in her home, "seemingly in rapid succession," occurred "with no regard for the impact of these changing relationships on [A.L.]." One of the relationships resulted in a referral to child protection services for possible sexual abuse, and A.L. received counseling. We detect no clear error in the court's finding that A.L. was harmed by Michelle's relationship choices.

[¶20.] On Michelle's next assertions — that Brent has failed to bond with and provide care to A.L., and that Brent's wife abuses alcohol — we find no clear error

in the court's findings.  The court considered the fact that Brent had little involvement with A.L. from birth to two years.  But over time Brent developed a bond with A.L.  At the time of the hearing, the court found that Brent established that he could meet A.L.'s needs: he used appropriate child rearing practices, had the financial ability to provide for her, was preparing her for responsible adulthood, and maintained a good value system.  The court also addressed the fact that when Brent began exercising visitation, it was at Cheryl's or his mother's home.  Brent testified that because of something Michelle said to his mother, he feared that having A.L. alone in his home would provoke allegations by Michelle of some impropriety.  Finally, on Michelle's claim that Brent's wife abuses alcohol, Brent's wife testified to consuming wine socially and to a history of DUI convictions.  Yet there was no evidence that A.L.'s relationship with Brent's wife was inappropriate, harmful, or otherwise negative.

[¶21.]	Michelle lastly argues that the court imposed an improper burden on her to prove a substantial change in circumstances before she could receive custody.  When custody has been obtained through a contested proceeding, one seeking to change custody must "show a substantial change of circumstances." *McKinnie v. McKinnie*, 472 N.W.2d 243, 244 (S.D. 1991); *Kolb v. Kolb,* 324 N.W.2d 279, 281-83 (S.D. 1982).  In its findings of fact, the circuit court noted that "[t]here were no changes in circumstances to warrant a reversal of the . . . change [of] custody of the minor child to father as of April 1, 2011."  In the April 1 hearing, the court only gave interim custody to Brent; therefore, Michelle would not have had the burden of proving a substantial change in circumstances to regain custody.  Despite the inapt

language, the court imposed no such burden. In deciding who should receive permanent custody, the court indicated that it would consider the evidence earlier offered at the interim hearing. The court was merely recognizing that the circumstances had not changed since the interim hearing, and therefore the rationale for its interim decision remained the same. Thus, the court did not impose a higher burden on Michelle.

[¶22.]    Affirmed.

[¶23.]    GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.