2004 SD 93

**Tor TOVSLAND, Plaintiff and Appellee,**

v.

**Tara L. REUB, Defendant and Appellant.**

No. 23017.

Supreme Court of South Dakota.

Considered on Briefs June 01, 2004.

Decided Aug. 18, 2004.

George J. Nelson, Rapid City, SD, for plaintiff and appellee.

Michael J. Whalen, Rapid City, SD, for defendant and appellant.

SABERS, Justice.

[¶ 1.] Mother, Tara Reub, appeals the circuit court's award of child support and arrearages for the child born to her and Father, Tor Tovsland. We affirm in part, reverse in part, and remand.

**FACTS**

[¶ 2.] Tor and Tara met in a bar in Rapid City in September of 1993. They began a sexual relationship which lasted until November 1993. The affair resulted in a pregnancy, but at the time the child was conceived, Tara was living with Randy Miller, and she initially assumed he was the child's father. The child was born when Tara was only 23 to 24 weeks pregnant. The child had severe and life threatening medical conditions which resulted in hospitalization for most of its first year. Total medical expenses were approximately $615,000.

[¶ 3.] At the time they met, Tor was a student at South Dakota School of Mines and Technology. He came to Rapid City from his home in Norway. After their relationship ended in November of 1993, Tor and Tara did not meet again until April of 1994 when they happened to see each other in a Denver bar. Tara was in Denver because the child was in the neonatal intensive care unit at a Denver hospital. Tara alleged that when she saw Tor, they spoke and that she informed him that he could possibly be the child's father. Tor denies that he was informed of his potential paternity, though he admits he went with Tara to the hospital to see the child.

[¶ 4.] Tara did not attempt to contact Tor again until December 1994. She final-ly located him in January of 1995, but by that time he was married and had returned to Norway. Tara contends that she made attempts to locate him at his former home in Rapid City and periodically did phone and internet searches for him. Despite these efforts, the parties did not see one another again until August of 2000 in another chance encounter at the Sturgis Motorcycle Rally. When they saw each other, they were both with friends at a concert at the Buffalo Chip Campground. Neither Tara nor Tor mentioned the child at this meeting, but Tara did learn that Tor had returned to live in Rapid City.

[¶ 5.] Approximately 10 months later, in June 2001, Tara phoned Tor's home to set up a meeting. The parties met at a bookstore and Tara requested that Tor take a paternity test. He declined, insisting that Miller take a test. In October, Miller took a paternity test that ruled him out as a potential father. It was at this time Tara contacted the Office of Child Support Enforcement. In June 2002, a paternity test revealed a 99.99% probability that Tor was the child's father.

[¶ 6.] After a hearing in August 2002, the child support referee entered findings of fact and conclusions of law. The referee found that 1) Tara notified Tor of the possibility of paternity in April 1994; 2) any delay in bringing the child support action was reasonable; and 3) Tor was not prejudiced. At the time the referee made his recommendations, Tor was unemployed. The referee recommended child support of $268 per month and arrearages in the amount of $33,698. Tor appealed to the circuit court.

[¶ 7.] The circuit court set aside all of the referee's findings and conclusions and held a court trial. The court found that Tor had proven his laches defense and that

Tara was not entitled to recovery of any arrearages prior to the June 2001 meeting at the bookstore. The circuit court also dismissed Tara's barratry action, in which she alleged that Tor's action for non-paternity was frivolous. In determining the amount of child support owing by Tor, the circuit court took into account the amounts Tara was entitled to receive from the fathers of Tara's other children. Ultimately, Tara was awarded $7,610.78 in arrearages and $775 per month in child support.[1] Tara raises eight issues on appeal:

1. Whether the circuit court exceeded its authority in setting aside the referee's findings and holding a de novo hearing on child support.

2. Whether the statute of limitations for recovery of the cost of pregnancy and confinement under SDCL 25–8–3 is six or eighteen years.

3. Whether the six year statute of limitation for child support under SDCL 25–8–5 is also applicable to recovery of medical expenses for children born out of wedlock.

4. Whether Father's absence from the country tolled the statute of limitations on recovery of child support and medical expenses.

5. Whether the circuit court abused its discretion in applying Laches.[2]

6. Whether the circuit court abused its discretion in considering child support from other fathers in determining child support.

7. Whether the circuit court abused its discretion in failing to award Mother attorney's fees.

8. Whether the circuit court erred in dismissing Mother's claim for barratry.

## STANDARD OF REVIEW

[¶ 8.] We will not disturb an award of child support unless the circuit court clearly abused its discretion. *Watson–Wojewski v. Wojewski*, 2000 SD 132, ¶ 14, 617 N.W.2d 666, 670 (citing *Steffens v. Peterson*, 503 N.W.2d 254, 257 (S.D. 1993)). We also review an award or denial of attorney fees for abuse of discretion. *Linard v. Hershey*, 489 N.W.2d 599, 603 (S.D.1992) (citing *Schmidt v. Schmidt*, 444 N.W.2d 367, 370 (S.D.1989)). Application of the doctrine of laches in a child support case is an issue of law which we review de novo. *Bennett v. Peterson*, 2003 SD 16, ¶ 13, 657 N.W.2d 698, 701. Whether equitable estoppel applies to deny past child support is a mixed question of law and fact which we review de novo. *Id.*

[¶ 9.] **1. WHETHER THE CIRCUIT COURT EXCEEDED ITS AUTHORITY IN SETTING ASIDE THE REFEREE'S FINDINGS AND HOLDING A DE NOVO HEARING ON CHILD SUPPORT.**

[¶ 10.] Procedurally, there were two files consolidated by the circuit court in this matter. Notice of Support Debt was dated July 11, 2002. Notice of the hearing before the child support referee was dated July 31, 2002. The hearing before the referee took place on August 14, 2002. Prior to that hearing, Tor filed a complaint on August 5, 2002, captioned "Petition Contesting Paternity." Tara counterclaimed raising issues of paternity, child

---

1. The reason for the substantial increase in the support amount from that imposed by the referee is that Tor became employed and was making approximately $70,000 annually at the time of judgment.

2. Tara included equitable estoppel in Issue 5 in her brief and reply brief, and Tor responded. However, the trial court did not reach estoppel in its decision even though it was an issue at the de novo hearing. *See* ¶ 11 *supra*.

support, medical expenses, barratry, punitive damages and attorney fees on August 13, 2002. In spite of the matter already pending in the circuit court, the child support referee proceeded to determine child support and arrearages. Tor filed objections to the referee's recommendations with the circuit court. The record is not entirely clear as to the course the circuit court intended to take with regard to˙ the separate files. However, it appears that the court consolidated the hearing on Tor's objections to the recommendations with the paternity petition and Tara's counterclaims. HT, Nov. 12, 2002, p. 17.

[¶ 11.] When the parties appeared before the court on Tor's paternity complaint and his objections to the referee's report, the circuit court decided to hold a de novo hearing on all of the issues between the parties, including paternity, child support and arrearages, Tor's claims of laches and estoppel, and Tara's claims of medical expenses, barratry, punitive damages and attorney fees. Tara contends that this decision to hold a de novo hearing was an abuse of the circuit court's discretion.

[¶ 12.] SDCL 25–7A–6 provides in part:

The [child support] referee shall make a report to the court, recommending the amount of the debt due to the state, if any, and the monthly support obligation of the parent and the arrearage debt due to the obligee [ ], or for health insurance coverage or genetic testing costs.

The referee shall file the report with the court[.] Any party shall have ten days from the date of service of the report in which to file objections to the report. [ ] If any objection is filed, the circuit court shall fix a date for hearing on the report, *the hearing to be solely on the record established before the referee.* The circuit court may thereafter adopt the referee's report, or may modify it, or may reject and remand it with instructions or for further hearing.[ ]

SDCL 25–7A–6 (emphasis supplied). Tara argues that the circuit court did not have the option to reject the referee's findings of fact and hold a de novo trial under this statute and our previously stated standards of review for child support recommendations. She asserts that the circuit court was bound to determine child support and arrearage issues "solely on the record established before the referee." In *Janke v. Janke,* 467 N.W.2d 494, 497 (S.D. 1991), we held:

[A] circuit court may not overturn a referee's findings unless the record reflects that, based upon its own review of all the evidence, the court is left with a definite and firm conviction that a mistake has been made. The referee's conclusions of law, however, are freely reviewable and may be overturned whenever they are thought to be incorrect.

[¶ 13.] At the initial hearing on the objections to the referee's report, the court stated:

Fundamentally, I want an expanded hearing on some issues. I don't think the referee's forum is the appropriate one in which to resolve some of them because of the time constraints, [ ] that attend[ ] that proceeding and the relative informal nature of it, and, frankly, the limited ability to conduct meaningful discovery, meaningful cross-examination[.]

After pointing out various issues to be determined at the hearing, the court stated, we'll transfer the child support hearing matter. "We're just going to transfer it into the paternity action to determine support issues." The parties and court then scheduled a hearing. Before the hearing closed, Tara's counsel inquired:

[ ] Am I correct in understanding that the court has applied the standard of review that appears in *Janke v. Janke* and that the court has found that there is or has a definite conviction, [a] mistake was made by the referee with regard to the issues that we're going to then be covering [at the hearing], the clearly erroneous—

The court responded:

I decided no. Whether it's right or wrong—it might be nice to search for reasons to do it, but my decision is based upon both fact and familiarity with the referee process. That given the issues of paternity at that time, the filings of a summons and petition for paternity, the determination of arrearages in an informal process is, under those particular circumstances attending this case, inappropriate for resolution in a referee's hearing, and [Tor's claims] call[ ] for a review by the circuit court of that, and I think that's appropriate and I don't think a true record review is appropriate. I think a de novo hearing is a more appropriate method of review for those issues. We're talking about substantial amounts of money, in one case, going back as far as nine years, and on the other hand, perhaps being as much as a couple years, and those are significant numbers to both parents and they have huge consequences to the child regardless of—on those decisions—and normally, half an hour appears to have been more than enough, and [the referee's] office over a microphone in an informal basis just does not seem to me in this case and under these circumstance[s] to meet the requirements for due process on those issues. I find that the referee [erred] in determining the child's income[.]

The court later indicated that it had transferred the proceeding to the court "by judicial fiat." Finally, the court noted, "the interest of justice requires a transfer of that hearing regarding the arrearages questions, statute of limitations, et cetera, belong in the circuit court, and that's where I'm moving it to."

**■■** [¶ 14.] Tara argues that the circuit court discarded the findings of the referee without review of the referee's evidential record. We note first that at the initial hearing on the issue, the circuit court indicated clearly that it had read the record as it appeared before the referee and that it had reviewed the transcript of the hearing before the referee. HT Nov. 12, 2002 p. 2. Furthermore, the court's statement that it found the referee erred in determining income was a sufficient finding of error to allow the circuit court to modify the referee's determination of child support and arrearages. Finally, the standards of review for the issues of laches, estoppel, statutory construction and attorney fees are legal questions which the circuit court was permitted to review de novo. *See Bennett*, 2003 SD 16 at ¶ 13, 657 N.W.2d at 701 (laches and estoppel); *Hedel–Ostrowski v. City of Spearfish*, 2004 SD 55, ¶ 4, 679 N.W.2d 491, 493 (statutory construction); *Osgood v. Osgood*, 2004 SD 22, ¶ 9, 676 N.W.2d 145, 148 (attorney fees).

**■** [¶ 15.] However, the circuit court's actions were not in accord with SDCL 25–7A–6, and the court erred in conducting a *de novo* review as a matter of law. However, Tara has not shown prejudice. In conducting appellate review, the appealing party must not only demonstrate error, but also prejudice. "The party alleging error on appeal must show such error affirmatively by the record and not only must the error be demonstrated but it must also be shown to be prejudicial error." *City of Sioux Falls v. Kelley*, 513 N.W.2d 97, 104 (S.D.1994) (citing *Shaffer*

*v. Honeywell, Inc.*, 249 N.W.2d 251 (S.D. 1976)). Here, Tara has not shown prejudice because the circuit court was not only reviewing the referee-established child-support obligation under SDCL 25–7A–6, but it was also presiding over an original paternity action under SDCL 25–7A–8. That latter statute required that the parallel paternity action be commenced as an original action in circuit court in accordance with SDCL Ch. 25–8. And, under SDCL Ch. 25–8, the circuit court had original, independent jurisdiction to determine the same issues considered by the referee; i.e. Tor's share of child support (*see* SDCL 25–8–5) and Tor's obligation for Tara's expenses of pregnancy and confinement (*see* SDCL 25–8–3). Because the circuit court had independent jurisdiction to decide the same issues the referee had decided, Tara was not prejudiced by the trial court's trial *de novo*. Therefore, we proceed to the court's determination of the issues.

**[¶ 16.] 2. WHETHER THE STATUTE OF LIMITATIONS FOR RECOVERY OF THE COST OF CONFINEMENT AND PREGNANCY UNDER SDCL 25–8–3 IS SIX OR EIGHTEEN YEARS.**

**and**

**[¶ 17.] 3. WHETHER THE SIX YEAR STATUTE OF LIMITATION FOR CHILD SUPPORT UNDER SDCL 25–8–5 IS ALSO APPLICABLE TO RECOVERY OF MEDICAL EXPENSES FOR CHILDREN BORN OUT OF WEDLOCK.**

[¶ 18.] Relying on SDCL 25–8–3, Tara requested that Tor be ordered to pay half the costs incurred by the child's premature birth and medical complications in the first years of his life. SDCL 25–8–3 provides:

> The father and mother of a child born out of wedlock are jointly and severally liable to pay the expenses of the mother's pregnancy and confinement.

The circuit court applied SDCL 25–8–5 to deny Tara's request. SDCL 25–8–5 provides:

> The mother may recover from the father a reasonable share of the necessary support of a child born out of wedlock.
>
> In the absence of a previous demand in writing served personally or by registered or certified letter addressed to the father at his last known residence, not more than six years' support furnished before bringing an action may be recovered from the father.

On appeal, Tara argues that the six-year limitation on recovery is applicable only to child support, and not the medical expense obligations of the parents. We agree that SDCL 25–8–5 is inapplicable in cases where a parent is being pursued for expenses other than monthly support of a child born out of wedlock. By its terms, SDCL 25–8–5 applies only to mothers of children born out of wedlock who are pursuing child support payments. Therefore, the circuit court erred in holding that SDCL 25–8–5 barred recovery of medical expenses in this case.

[¶ 19.] Tara argues that under SDCL 25–8–9, she was entitled to bring proceedings to enforce Tor's obligation for medical expenses any time before the child reaches majority, thereby giving her an eighteen-year statute of limitation on the recovery of medical expenses. SDCL 25–8–9 provides:

> Proceedings to establish paternity and enforce the obligation of the father may be brought at any time before the eighteenth birthday of the child.

Tara's assertion cannot be maintained. SDCL 25–8–7 provides in part:

> An action to determine paternity or proceedings to compel support by the father

are civil actions governed by the Rules of Civil Procedure. They are not exclusive of other proceedings that may be available on principles of law or equity. Upon determining paternity of a child, the court shall give judgment declaring the paternity of the father to the child. The court may award a money judgment to the appropriate party for the recovery of the reasonable expenses of the mother's pregnancy and confinement, for the education, support, or funeral expenses for the child, or for any other expenses with respect to the child as the court deems reasonable.

The court shall enter an order for the support and custody of the child. The court may require the person ordered to pay support to give reasonable security for providing the support. The court may modify or vacate any order issued pursuant to this section at any time.

Applying the Rules of Civil Procedure, a mother could be pursued for costs of pregnancy and confinement up to six years under SDCL 15–2–13 which provides in part:

> Except where, in special cases, a different limitation is prescribed by statute, the following civil actions other than for the recovery of real property can be commenced only within six years after the cause of action shall have accrued: (1) An action upon a contract, obligation, or liability, express or implied, excepting those mentioned in §§ 15–2–6 to 15–2–8, inclusive, and subdivisions 15–2–15(3) and (4);
>
> (2) An action upon a liability created by statute other than a penalty or forfeiture; excepting those mentioned in subdivisions 15–2–15(3) and (4)[.]

*See also, Hershey v. Hershey,* 467 N.W.2d 484, 486 (S.D.1991) (actions seeking to enforce support provisions based on common-law duty of parental support or breach of contract are governed by six-year limitations period of SDCL 15–2–13). SDCL 25–8–9 deals solely with paternity and enforcement of a fathers obligations. To accept Tara's argument that the statute creates an eighteen-year statute of limitation on fathers liability for pregnancy and confinement expenses would create an absurd result. *Helmbolt v. LeMars Mut. Ins. Co., Inc.,* 404 N.W.2d 55, 59 (S.D.1987) (we should not presume the Legislature intended an absurd result) (additional citations omitted). Under SDCL 25–8–3, the parents are jointly and severally liable for those expenses. If, for instance, a third party, such as a hospital, was owed payment for those expenses, they could pursue mother and father, jointly and severally. However, under Tara's interpretation of the statute, the hospital would have only six years to pursue mother under SDCL 25–8–7, but eighteen years to pursue father under SDCL 25–8–9. The Legislature could not have intended such a result. A better reading of the statutory scheme is that a father may be pursued for paternity and support obligations until the child reaches majority, but may only be held liable for six years preceding the paternity action absent proper notice or tolling of the statute of limitation.

[¶ 20.] Although the circuit court's reason for imposing a six-year statute of limitation was incorrect, the result was correct and we affirm the circuit court on this issue. *See Owens v. City of Beresford,* 87 S.D. 8, 15, 201 N.W.2d 890, 893 (1972).

[¶ 21.] 4. **WHETHER FATHER'S ABSENCE FROM THE COUNTRY TOLLED THE STATUTE OF LIMITATIONS.**

[¶ 22.] The circuit court held that the six-year statute of limitations on child support was not tolled during Tor's three-year absence from the country. The cir-

cuit court found that Tara's efforts to find Tor during those three years were insufficient. The court found that Tara did not exercise sufficient diligence to find him because 1) she "made no serious effort to find [Tor's wedding] announcement" in the Rapid City Journal[3]; 2) if she had found the announcement, Randy Miller could have found Tor because Miller grew up in the same neighborhood as Tor's wife, "knew her well, and her parents still resided at the same address;" 3) Tara made no inquiry through the School of Mines or INS; 4) the child "was well provided for by Randy and Tara. There was no need of support;" 5) seeking support would have disrupted Tara and Randy's relationship; 6) Tara inadequately pursued and enforced child support orders against fathers of her other children; and 7) Tara did not start this action until after her relationship with Randy ended.

[¶ 23.] SDCL 15–2–20 provides:

If when the cause of action shall accrue against any person he shall be out of the state, such action may be commenced within the terms herein respectively limited after the return of such person into this state; and if after such cause of action shall have accrued, such person shall depart from and reside out of the state, the time of his absence shall not be deemed or taken as any part of the time limited for the commencement of such action[.]

We have held that a defendant's absence from the state, standing alone, does not activate the tolling provisions of SDCL 15–2–20. *Openhowski v. Mahone*, 2000 SD 76, ¶ 15–16, 612 N.W.2d 579, 582–83 (citing *Burke v. Foss*, 334 N.W.2d 861, 863 (S.D. 1983)). The defendant's absence "must be coupled with the plaintiff's inability to pur-

sue his remedy because of the absence." *Id.* (citations omitted). Furthermore, "where provision is made by statute for substituted service of process, the provision makes the defendant as amenable to process as if he resided within the state and has the effect of nullifying any statute suspending the period of limitations." *Id.* (additional citations omitted).

[¶ 24.] As noted above, SDCL 25–8–5 provides in part:

In the absence of a previous demand in writing served personally or by registered or certified letter addressed to *the father at his last known residence,* not more than six years' support furnished before bringing an action may be recovered from the father.

(Emphasis supplied.) This statute gave Tara the ability to pursue her child support remedy regardless of whether she was able to locate Tor in Norway. Simply mailing a registered or certified letter to Tor's last known address would have permitted pursuit of her remedy for the full amount, *e.g.* child support from birth of the child. Assuming that the doctrines of laches and estoppel do not apply, Tara is therefore entitled only to child support arrearages dating back to July 8, 1996, six years from the date of mailing the notice of support debt with no tolling for the period Tor was in Norway.

[¶ 25.] However, as noted above, SDCL 25–8–5 applies only to her entitlement to child support. SDCL 15–2–20 does operate to toll the statute of limitations for collection of Tor's share of the child's medical expenses at and subsequent to his birth. Therefore, Tara should have been permitted to recover 50% of the medical expenses that were not covered by insur-

---

**3.** At the time the wedding announcement appeared in the newspaper, Tara worked for the paper in the graphics design department. However, in her daily duties, she would have had no cause to view the wedding announcements.

ance. The evidence at trial indicated that the total non-covered costs were $14,717.20. Tor's share of the expenses would be $7,358.60.

**[¶ 26.] 5. WHETHER THE CIRCUIT COURT ABUSED ITS DISCRETION IN APPLYING LACHES.**

[¶ 27.] The circuit court held that the doctrine of laches applied to bar recovery of child support prior to June 1, 2001, the day the parties met at the bookstore and Tara requested that Tor take a paternity test.

[¶ 28.] To establish laches, Tor had the burden of proving that: 1) Tara had full knowledge of the facts upon which the action was based, 2) regardless of her knowledge, she engaged in unreasonable delay in commencing suit, and 3) allowing her to maintain the action would prejudice other parties. *Bonde v. Boland*, 2001 SD 98, ¶ 17, 631 N.W.2d 924, 927 (quoting *Conway v. Conway*, 487 N.W.2d 21, 24 (S.D.1992) (additional citations omitted)).

[¶ 29.] Our most recent decision regarding the doctrine of laches in a child support case was *Bennett v. Peterson*, 2003 SD 16, 657 N.W.2d 698. The discussion reveals that laches and estoppel are not favored defenses in the context of child support. We quoted other jurisdictions with approval, such as, *Rodgers v. Woodin*, from the Superior Court of Pennsylvania:

> There can be no laches involved as to the rights of children in such circumstances [paternity actions]. As with children born in wedlock, the right to support cannot be bargained away by the parents nor *can the failure to ask for support at a given moment preclude that right at a subsequent time, no matter how much time has intervened.* [ ]

*Bennett*, 2003 SD 16 at ¶ 21, 657 N.W.2d at 703 (quoting *Rodgers v. Woodin*, 448

Pa.Super. 598, 672 A.2d 814, 818 (1996)). We also quoted the Supreme Judicial Court of Maine, which ruled, based on child support and arrearages statutes similar to ours, that:

> We will not allow such a carefully crafted policy to be defeated by the invocation of equitable defenses in circumstances where the Department has not affirmatively misled the father to believe he would bear no responsibility.

*Id.* (citing *Department of Human Services v. Bell*, 711 A.2d 1292, 1295–1296 (Me. 1998)). Finally, we noted:

> [A]t least one justice of this Court has articulated that "the right to support belongs to the children." [*In re*] *Loomis*, 1998 SD 113, at ¶ 31, 587 N.W.2d [427] at 432 (J. Konenkamp, dissenting) (citing *Weegar v. Bakeberg*, 527 N.W.2d 676, 679 (S.D.1995)). Additionally, "parents may not through misconduct or mistake prejudice their children's right to support." *Id.* at ¶ 32 (citing *Stach v. Stach*, 369 N.W.2d 132, 135–136 (S.D. 1985) (holding father was required to make child support payments despite mothers noncompliance with the court's order to pay father his share of equity in marital home)). These comments are constant reminders of what our statutes are designed to protect and epitomize the public policy contained in this area of law.

*Id.*

[¶ 30.] The circuit court's reasons for finding laches were that *not* finding laches would 1) "reward irresponsible behavior by Tara"; 2) "provide a windfall as there is no evidence that the child ever lacked for any necessity nor even the amenities of life;" 3) "add insult to injury rewarding Tara for preventing the establishment of a father-son relationship and create an economic hardship on Tor and the family he started without knowledge of this child."

[¶ 31.] The determinations that permitting child support arrearages to the extent specifically permitted by our child support statutes would result in a reward for irresponsible behavior or a "windfall" are not supported here. Child support is for the benefit of the child, not the mother, and he is entitled to support from both parents. The fact that his mother has been fortunate enough to be able to provide his basic needs does nothing to decrease the support owed the child by his father.

[¶ 32.] The final justification given by the court is worthy of greater consideration. Tor has married and has two children from that marriage. Payment of support for this child will create a new impact on his family's finances and could amount to "prejudice" sufficient to meet the third element of laches. Even in light of this consideration, the elements for laches have not been met.

[¶ 33.] Arguably, element one, that Tara had full knowledge of the facts upon which the action is based, has been met. She suspected at the time the child was born that there was a 50% chance that Tor could be the father. However, element two, that regardless of her knowledge, she engaged in an unreasonable delay in commencing the suit, has not been met.

[¶ 34.] The child was born at between 24 and 26 weeks gestational age. He had Group B Strep and was given a five percent chance of living. He had hyaline membrane disease, no lung development, an intracranial hemorrhage, liver disease, lung disease and suffered from multiple seizures. He also suffered sleep apnea. In the first year of his life, he spent approximately four months at a hospital in Denver. His mother commuted to Denver from Rapid City as often as possible but could not stay with the child full time because she needed to keep her job to keep her insurance benefits for the child.

He remains a high maintenance child who is legally blind and possibly suffers from Ausberger's Syndrome, a form of high functioning autism. Despite these difficulties, Tara testified that she attempted to contact Tor in the first year after the child's birth at his last known address. She also attempted internet and directory searches periodically through the years. To her knowledge, he was in Norway for several years and she did not feel she had the means to track him down. Her attempts to get in contact with Tor, coupled with the difficulties of making a life for all of her children indicate that the delay in this case was not unreasonable, and not solely attributable to Tara's actions.

[¶ 35.] The circuit court found Tor to be more credible in his assertion that despite accompanying her to the hospital and viewing the child, he had no inkling of his potential paternity. The circuit court's determination was clearly erroneous in light of the fact that Tor's credibility was seriously called into question when it was revealed at trial that he was "inaccurate" in his answers to interrogatories. Specifically, in response to Tara's allegation that Tor mentioned the baby looked like him, he claimed that he could not see the child's face because the child was wearing a respiration mask. A claim he later testified at trial was "planted on him" by his prior attorney. HT 133–35. Regardless, there is no indication on the record that Tara affirmatively acted to hide the fact of her pregnancy or mislead Tor as to his potential paternity. Accordingly, Tor has not established laches or equitable estoppel.

[¶ 36.] 6.WHETHER THE CIRCUIT COURT ABUSED ITS DISCRETION IN CONSIDERING CHILD SUPPORT FROM OTHER FATHERS IN DETERMINING CHILD SUPPORT.

[¶ 37.] In its memorandum opinion, the circuit court found:

[The child] was well provided for by Randy and Tara. There was no need for support, particularly when getting the support would disrupt the relationship between Randy and Tara, Randy and [the child] and [the child] and his siblings. Money has not been an issue, at least in regard to any of the fathers of Tara's children except for Tor. She has a $550 a month order in place against Randy, but receives nothing and seeks nothing. She has had an order against an engineer from the east coast who can afford to fly out monthly to see his child, but only pays support at an impossibly low level of $292 a month. There has never been an effort to update that ten year old order.

Tara also points to the stipulated statement of the proceedings from a hearing on February 3, 2003 on Tara's Motion for Entry of Order of Support:

The Court commented that the legislature and the guidelines permitted the court to consider equity and fairness in the matter of allowing deviations and that Tara could have an additional $725 per month for her other children if she so desired. The court stated it was apparently Tara's choice not to obtain the support to which she was entitled from the "other dads." The court further stated it was inequitable and wrong for Tor to subsidize Tara's other children under the circumstances. The court noted that the evidence showed the child support orders on Tara's other children were substantially below the guideline amounts and that the defendant had failed to demonstrate that the child's needs would not be met by the guideline amount of $775 per month. The court denied the defendant's claim of upward deviation.

Tara argues that the circuit court's consideration of support from the other fathers influenced its determinations regarding arrearages and support deviations. Because of this influence, Tara claims the court abused its discretion in refusing her request for an upward deviation based on the child's special needs.

[¶ 38.] Tara argues that she introduced evidence of the child's special needs and that there was nothing in the record refuting that evidence. Tara and Judith Kennedy, the child's school psychologist, testified to the special needs of the child, including needs associated with visual and hearing impairments, bowel problems, unawareness of danger, behavioral problems and possible Ausberger's Syndrome. Tara testified that those needs averaged a cost of between $150 and $160 per month.

[¶ 39.] Contrary to the circuit court's various findings, the evidence in the record established that although Randy provided for his two children in the home, Tara paid the expenses for this child by herself. Tara does have a $550 per month order in place against Randy, but it is not established that she "receives nothing and seeks nothing." The reason she is not currently enforcing the order is that Randy is contributing to the support of his two children who reside with Tara. Support that a mother could possibly receive in the future from other fathers is not a factor in determining whether a child is entitled to an upward deviation for special needs. The circuit court abused its discretion in using this as a basis to deny the upward deviation for this child's special needs.

[¶ 40.] Because the court's factual findings supporting its denial of the deviation are clearly erroneous, we reverse and remand this portion of the court's decision for reconsideration of an upward deviation of both current child support and arrearages.

**[¶ 41.] 7. WHETHER THE CIRCUIT COURT ABUSED ITS DISCRETION IN FAILING TO AWARD MOTHER ATTORNEY'S FEES.**

[¶ 42.] Tara asserts that the circuit court erred in denying her request for attorney fees. When a party requests attorney fees, the circuit court must first consider what constitutes reasonable attorney fees and, second, it must decide what portion of such fee, if any, should be allowed as costs and paid by the opposing party in the action. *Pribbenow v. Van Sambeek*, 418 N.W.2d 626, 630 (S.D.1988) (citations omitted). The determination turns on the consideration of 1) the property owned by each party; 2) the relative income of the parties; 3) whether the property of the parties is in liquid or fixed assets; and 4) whether the actions of either party increased unreasonably the time spent on the case. *Id.* We review the circuit court's determination whether to award attorney fees for abuse of discretion.

[¶ 43.] Tara's assertion that she is entitled to attorney fees is based primarily on her contention that Tor unreasonably increased the time spent on this case by filing his petition asserting non-paternity. SDCL 25–8–58 provides that genetic test results that establish a threshold probability of paternity of 99% or more create a *rebuttable* presumption of paternity. At the time Tor brought his petition regarding paternity, SDCL 25–8–59 and SDCL 25–7A–8 provided the presumptive father with sixty days to commence an action in circuit court to rebut the presumption.[4] Tor was within his rights to assert non-paternity. Tara has not shown that his petition unreasonably increased the amount of time taken in litigation, especially in light of the fact that regardless of the paternity action, the same proceedings, including her need to hire an attorney, would have occurred based on Tor's objections to the referee's recommendations. Tara has not established that the circuit court abused its discretion in denying her request for attorney fees in the paternity action.

**[¶ 44.] 8. WHETHER THE CIRCUIT COURT ERRED IN DISMISSING MOTHER'S CLAIM FOR BARRATRY.**

[¶ 45.] Tara asserts that by his petition denying paternity, Tor committed barratry. SDCL 20–9–6.1 provides:

> Barratry is the assertion of a frivolous or malicious claim or defense or the filing of any document with malice or in bad faith by a party in a civil action. Barratry constitutes a cause of action which may be asserted by filing a pleading in the same civil action in which the claim of barratry arises or in a subsequent action. A claim of barratry shall be determined in the same manner as any other substantive cause of action asserted in that civil action.

Tara argues that Tor had "no reason in fact or law to expect a judicial ruling of non-paternity," and therefore his claim was malicious or frivolous within the meaning of the barratry statute. We disagree. A positive paternity test creates a rebuttable presumption of paternity. SDCL 25–

---

**4.** On April 28, 2003, this Court held that SDCL 25–8–59 was unconstitutional in *DSS v. Byer*, 2004 SD 41, 678 N.W.2d 586. That case is currently pending before the Court on the State's petition for rehearing. The resolution of *Byer* has no impact on our holding in this case, because under this issue and Issue 8, our only inquiries are whether, at the time he filed his complaint, Tor's claim unreasonably extended the time spent on this case, and whether his claim was frivolous or malicious.

8-58. Generally, one challenging the rebuttable presumption should have evidence to support the challenge. Here, Tor did not. However, once he had the opportunity to review the results of the test and testing procedures, Tor dropped his argument and admitted paternity on the record. Therefore, Tara fails to show how she was prejudiced by his initial assertion of non-paternity. Had Tor continued to press the issue, Tara may have had a claim for malicious prosecution. However, under these facts, the claim for barratry does not withstand scrutiny. The statutes by their terms recognize the putative fathers right to contest the presumption. SDCL 25-8-58; SDCL 25-8-59. To allow a claim for barratry on the simple assertion that the father claimed non-paternity would be to ignore the putative fathers rights under the law. The circuit court is affirmed on this issue.

[¶ 46.] We affirm the circuit court on Issues 1,2,3,7 and 8. We reverse the circuit court on Issues 5 and 6. We affirm in part and reverse in part on Issue 4.

[¶ 47.] GILBERTSON, Chief Justice, and KONENKAMP, ZINTER and MEIERHENRY, Justices, concur.